# EXHIBIT  2

# EXHIBIT  2

**PROMISSORY LOAN AGREEMENT**

MADE BETWEEN

**NORMAN INTERTRADE LTD**
*the Lender*

AND

**HONESTBEE PTE. LTD.**
*the Borrower*

AND

**CHA-HONG KOO**
*Guarantor 1*

AND

**BON-WOONG KOO**
*Guarantor 2*

*Dated _____ 5/24/2019 _____*

**THIS PROMISSORY LOAN AGREEMENT** (the "**Agreement**") is made as a deed on 24th May,2019 "**Execution Date**").

**AMONG:**

(1)   **NORMAN INTERTRADE LTD,** a company incorporated in the British Virgin Islands under registered number 1613261 and having its registered office at Trident Chambers, PO Box 146, Road Town, Tortola, British Virgin Islands (the "**Lender**");

  **AND**

(2)   **HONESTBEE PTE. LTD.** (Company Registration No. 201217834C), a company incorporated in Singapore with its registered address at 2 Alexandra Road, #04-01B, Delta House, Singapore 159919 (the "**Borrower**" or the "**Company**");

  **AND**

(3)   **CHA-HONG KOO** (also known as **JOHN KOO**), an individual, who resides in, Seoul, Republic of Korea ("**Guarantor 1**");

  **AND**

(4)   **BON-WOONG KOO** (also known as **BRIAN KOO**), an individual, who resides in Los Altos, CA ("**Guarantor 2**").

Guarantor 1 and Guarantor 2 hereinafter collectively referred to as the "**Guarantors**" and each a "**Guarantor**". The Lender, the Borrower and the Guarantors hereinafter collectively referred to as the "**Parties**" and each a "**Party**".

**WHEREAS**:

(1)   The Borrower requires financing for the development of its business, including for increasing the working capital and repaying debts owed by the Borrower to the third parties.

(2)   The Lender has available funds and agreed to provide or procure the provision of the financing to the Borrower in the amount of US$ 1,500,000on the terms of a convertible loan and on other terms provided in this Agreement.

(3)   For the purpose of guaranteeing the obligations of the Borrower under this Agreement, each Guarantor has agreed to enter into this Agreement and Deed of Guarantee and Indemnity.

(4)   Each of the Parties enters into this Agreement in consideration of other Parties entering into this Agreement and accepting its terms.

**NOW IT IS HEREBY AGREED** as follows:

1.   **INTERPRETATION**

  1.1.   **Definitions**: In this Agreement, except to the extent that the context requires otherwise:

2

"**Affiliate**" means, with respect to any person, any other person that, directly or indirectly, Controls, is Controlled by, or is under common Control with such person;

"**Business Day**" means a day other than Saturday and Sunday or public holiday in Singapore,  Ukraine or the USA on which banks generally are open in Singapore, Kyiv, Ukraine and New York, USA for the transaction of normal banking business, and where used to specify a period within which any act is to be done or not to be done, a day other than a day which is a Saturday, Sunday or public holiday in any country in which such act is to be done or not to be done;

"**Control**" means:

(a)     the ownership of or the ability to direct:

    (a)     in the case of a company:

        (A)     a majority of the issued shares entitled to vote for the election of directors (or analogous persons) of such company;

        (B)     the appointment or removal of directors having a majority of the voting rights exercisable at meetings of the board of directors (or analogous body or bodies, including management boards and supervisory boards) of such company on all, or substantially all, matters; or

        (C)     a majority of the voting rights exercisable at general meetings of the members of such company on all, or substantially all, matters; or

    (b)     in the case of any other person, a majority of the voting rights in such person; or

(b)     the direct or indirect possession of the power to direct, or cause the direction of, the management and policies of any person (whether through the ownership of voting securities, by contract or otherwise),

and "**Controlled**" shall be construed accordingly, and "**Change of Control**", in relation to that body corporate, occurs if a person who Controls it (the beneficial owner) ceases to do so (including as a result of a reorganisation in the course of which the body corporate ceases to exist) or if another person acquires Control of it;

"**Conversion Amount**" has the meaning given in Clause 8.1;

"**Conversion Date**" means the date, which occurs within five (5) Business Days after the Lender sends the Conversion Notice or such later date as the Lender may specify in the Conversion Notice;

"**Conversion Event**" means occurrence of all (and not only some) of the following events:

(a)     the Lender having provided to the Borrower the full amount of the Loan; and

(b)     the Lender having sent the Conversion Notice to the Borrower;

"**Conversion Notice**" has the meaning given in Clause 8.1;

"**Conversion Shares**" means number of the Ordinary Shares equal to the quotient obtained by dividing the Conversion Amount by Conversion Share Price;

"**Conversion Share Price**" means the price per share, which is equal to the lower of the following prices:

(a)     Borrower's valuation at the Last Equity Financing adjusted for the discount of 20% divided by the number of Ordinary Shares; and

(b)     Borrower's valuation at the Next Equity Financing adjusted for the discount of 20% divided by the number of Ordinary Shares.

"**Conversion**" means the conversion of the Outstanding Loan into Conversion Shares as set out hereunder;

"**Corporate Transaction**" means (i) the acquisition of the Borrower by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) provided that the applicable transaction shall not be deemed an acquisition unless the Borrower's shareholders constituted immediately prior to such transaction hold less than 50% of the voting power of the surviving or acquiring entity, or (ii) a sale of all or substantially all of the assets of the Borrower;

"**Encumbrance**" means any mortgage, charge, pledge, lien, option, restriction, assignment, hypothecation, security interest, title retention or any other agreement or arrangement, the effect of which is the creation of security, or the creation of a right to acquire (including any option, right of first refusal or right of pre-emption), third party right or interest, other encumbrance or security interest or derivative interest of any kind, or any other type of preferential arrangement (including a title transfer or retention arrangement) having similar effect (and, where used in respect of any shares, voting trust, voting agreements, right first refusal, pre-emption or similar rights or arrangements) and any agreement to create any of the foregoing, and "**Encumber**" shall be construed accordingly;

"**Event of Default**" has the meaning given in Clause 6.1;

"**Interest Rate**" means 18.0% per annum;

"**IPO**" means underwritten initial public offering of the shares in the share capital of the Borrower representing not less than 20% of all shares in the share capital of the Borrower on a Recognized Investment Exchange;

"**Last Equity Financing**" means Ordinary Shares issuance occurred on the 24th May, 2019 as a result of closing the "Series A" Financing;

"**Liquidity Event**" has the meaning given in clause 7 (*Liquidity Events*);

"**Loan**" means the senior term loan in the Principal Amount provided by the Lender to the Borrower in accordance with the terms and conditions set out hereunder. The Guarantors, jointly and severally, unconditionally and irrevocably guarantee the Loan as provided in more details in the Deed of Guarantee and Indemnity entered into among the Guarantors and the Lender on or about the date of this Agreement;

4

"**Maturity Date**" means the 271st calendar day following the date of disbursement of the Loan, on which the Outstanding Loan shall be fully redeemed;

"**Next Equity Financing**" means issuance (or series of issuances) of Ordinary Shares at a valuation of the Borrower where the Borrower receives gross proceeds of not less than US$10,000,000;

"**Ordinary Shares**" means ordinary shares in the share capital of the Borrower;

"**Outstanding Loan**" means the remaining Principal Amount, capitalized interests, accrued and unpaid interest;

"**Principal Amount**" means US$1,500,000;

"**Purposes**" has the meaning given in Clause 2.1;

"**Recognized Investment Exchange**" means the main markets of any of the following stock exchanges:

(a)     Vienna Stock Exchange;

(b)     London Stock Exchange;

(c)     New York Stock Exchange;

(d)     NASDAQ Stock Exchange;

(e)     Hong Kong Stock Exchange;

(f)     Singapore Stock Exchange;

(g)     Frankfurt Stock Exchange; or

(h)     Euronext Amsterdam;

(i)     or other reputable investment exchange as may be agreed with the Lender;

"**Repayment**" means the actual repayment in full of the Outstanding Loan;

"**US$**" means the official currency of the United States of America.

1.2.    **Miscellaneous Construction:**

1.2.1.   In this Agreement, unless the contrary intention appears, a reference to:

1.2.1.1. an "**amendment**" includes a supplement, novation, restatement or re-enactment and "amended" will be construed accordingly and signed by both Parties;

1.2.1.2. a "**person**" includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency,

5

organization or other entity whether or not having separate legal personality;

1.2.1.3. a **"regulation"** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organization;

1.2.1.4. a provision of law is a reference to that provision as extended, applied, amended or re-enacted;

1.2.1.5. a Party or any other person includes its successors in title, permitted assigns and permitted transferees.

1.2.2.   Unless the contrary intention appears, a reference to a **"month"** or **"months"** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

1.2.2.1. if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

1.2.2.2. if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

1.2.2.3. notwithstanding sub-paragraph 1.2.2.1 above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

1.2.3.   The headings in this Agreement are inserted for convenience only and shall be ignored in construing this Agreement. Unless the context requires otherwise, words denoting the singular number only shall include the plural and vice versa, and words denoting one gender shall include other genders.

1.2.4.   References to **"Clauses"**, **"Schedules"** and **"Appendices"** are to be construed as references to the clauses of, and the schedules and appendices to this Agreement.

1.2.5.   In this Agreement, unless specified otherwise:

1.2.5.1. the rule known as the ejusdem generis rule shall not apply and accordingly general words introduced by the word **"other"** shall not be given a restrictive meaning by reason of fact that they are preceded by words indicating a particular class of acts, matters or things;

1.2.5.2. general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

1.2.5.3. the contra proferentum rule of construction of contracts shall not apply; and

1.2.5.4. "**including**" means "including without limitation" (with related words being construed accordingly), "**in particular**" means "in particular but without limitation" and other general words shall not be given a restrictive interpretation by reason of their being preceded or followed by words indicating a particular class of acts, matters or things.

## 2.     THE LOAN

2.1.    The Borrower has requested the Lender to, and the Lender has agreed to, make available to the Borrower the Loan for the purposes herein stated, to be repayable by the Borrower to the Lender in accordance with the terms herein stated. The Loan shall be used by the Borrower for its working capital purposes and repaying any debts owed to third parties (together, the "**Purposes**").

2.2.    The Loan shall be granted by means of bank transfer to the Borrower's bank account[within five (5) Business Days following the Execution Date. The Loan shall be deemed granted after the funds in the amount of the Loan are duly debited from the bank account of the Lender.

2.3.    No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage.

## 3.     INTEREST

3.1.    The Loan is granted at the Interest Rate with a "Actual/360" day count convention payable on a monthly basis.

3.2.    Accrued interest is paid on 31st, 61st, 91st, 121st, 151st, 181st, 211st, 241st and 271st calendar day following the date of disbursement of the Loan.

## 4.     REPAYMENT

4.1.    The Loan is repaid in six equal instalments on 121st, 151st, 181st, 211st, 241st and 271st calendar day following the date of the granting the Loan.

4.2.    Notwithstanding anything to the contrary in this Agreement, if the Borrower intends to undertake any subsequent fund raising (including both equity and debt), the Borrower shall have the option to repay the Loan amount prior to the Maturity Date, upon prior written consent of the Lender ( the "**Early Repayment**").

4.3.    The Early Repayment shall not release the Borrower from the obligation to repay the Accrued interest in the amount calculated as if the Loan was repaid on the Maturity Date.

4.4.    It is the intention of the Parties that the payment made by the Borrower under clause 4.3 is an elective contractual payment and not a payment for breach, provided that in the event that such payment, contrary to such stipulation, is treated as a payment for breach, it shall be treated as liquidated damages and a

genuine pre-estimate of loss of the Lender agreed to protect the legitimate interest of the Lender.

**5.    DEFAULT**

5.1.    Upon and at any time after the occurrence of the Event of Default or the Liquidity Event, and for so long as it is continuing, the Lender may (in its sole discretion) by notice in writing to the Borrower declare the Outstanding Loan and all other amounts accrued or outstanding under the Agreement to be immediately due and payable on written demand, whereupon the Outstanding Loan shall be immediately due and payable on written demand.

5.2.    The Borrower shall notify the Lender of any Event of Default (and the steps, if any, being taken to remedy it) or the Liquidity Event promptly, but in any case not later than three (3) Business Days upon becoming aware of its occurrence.

**6.    EVENTS OF DEFAULT**

6.1.    **Event of Default**: Occurrence of any of the events provided for in Clauses 6.2 (*Insolvency*) to 6.10 (*Unlawfulness*) shall constitute an event of default (the "**Event of Default**").

6.2.    **Insolvency**: The Borrower is or is presumed or deemed to be unable, or admits inability to pay its debts as they fall due, (by reason of actual or anticipated financial difficulties), suspends making payments on any of its debts, or (by reason of actual or anticipated financial difficulties) commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness.

6.3.    **Insolvency proceedings**: Any corporate action, legal proceedings or other procedure or step is taken in relation to:

6.3.1.    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Borrower;

6.3.2.    a composition, compromise or arrangement with any creditor of the Borrower; or

6.3.3.    the appointment of a liquidator, provisional liquidator, administrator, trustee in bankruptcy, receiver, administrative receiver, compulsory manager or similar officer in respect of the Borrower or any of its assets,

6.3.4.    or any analogous procedure or step is taken in any jurisdiction.

6.4.    **Misuse of Loan**: The Borrower uses the Loan for the purposes other than the Purposes.

6.5.    **Non-payment**: The Borrower does not pay on the due date any amount payable pursuant to the Agreement at the place at and in the currency in which it is expressed to be payable unless its failure to pay is caused by administrative or technical error, and the payment is made within ten (10) Business Days of its due date.

6.6.    **Covenants**: The Guarantors or the Borrower fail(s) to perform in a timely manner any of their obligations under the Agreement, including breach of undertakings provided under Clause 12 (*Covenants*) and, if capable of remedy, such failure to perform has continued for a period of ten (10) Business Days after the notice of such breach has been given to the Borrower or the

Guarantors by the Lender.

6.7. **Misrepresentation**: Any representation, statement or warranty made, repeated or deemed to be made by the Borrower or the Guarantors in the Agreement or in connection with the Agreement is (or proves to have been) incomplete, untrue, incorrect or misleading in any material respect when made, repeated or deemed to be made.

6.8. **Change of Control**: Change of Control occurs in respect of the Borrower (except for when Change of Control occurs as the result of the Liquidity Event);

6.9. **Material adverse effect:** Any circumstance or event occurs (including the commencement of any litigation, arbitration or administrative proceeding) which, in the reasonable opinion of the Lender, is likely to have a material adverse effect.

6.10. **Unlawfulness:**

6.10.1. There occurs a change of law which has a material adverse effect.

6.10.2. It is or becomes unlawful for the Borrower or the Guarantors to perform any of their obligations under the Agreement.

6.10.3. Any obligation or obligations of the Borrower or the Guarantors under the Agreement are not or cease to be legal, valid, binding or enforceable, and the cessation individually or cumulatively materially and adversely affects the interests of the Lender under the Agreement.

6.10.4. The Agreement ceases to be in full force and effect, or the Agreement ceases to be legal, valid, binding, enforceable or effective, or is alleged by the Party to it (other than the Lender) to be ineffective.

## 7.  LIQUIDITY EVENTS

Any of the following events or circumstances shall constitute a Liquidity Event:

7.1. IPO;

7.2. the Corporate Transaction; or

7.3. the Next Equity Financing.

## 8.  CONVERSION

8.1. At any time, when this Agreement is effective and the Loan has been disbursed, the Lender shall be entitled at its sole discretion to serve a notice on the Borrower substantially in the form provided for in Schedule (*Form of Conversion Notice*), constituting the Conversion Event, requesting the Borrower and the Guarantors to convert all or any portion of the Outstanding Loan (hereinafter referred to as "**Conversion Amount**") into the Conversion Shares on the Conversion Date (the "**Conversion Notice**"). The service of the Conversion Notice shall be revocable.

8.2. Subject to the receipt of the Conversion Notice, on the Conversion Date, the Borrower shall, and the Guarantors shall procure that the Borrower shall, and the Guarantors (as the ultimate beneficial owner of the Borrower) hereby instruct the directors of the Borrower to perform the following actions:

8.2.1.  issue the Conversion Shares to the Lender free from any Encumbrances in consideration of the rights of the Lender under the Loan in the part of the Conversion Amount;

8.2.2.  transfer the share certificates in respect of the Conversion Shares to the Lender;

8.2.3.  make a record to shareholders' register of the Borrower, indicating the Lender as the owner of the Conversion Shares; and

8.2.4.  sign all such resolutions, deeds, agreements, documents, notices, acknowledgements, consents, waivers, letters and other ancillary documents (in each case in such form and with such amendments, whether substantive or otherwise as the Lender may think fit) and to do all such other acts and things, in each case as may be necessary, desirable or otherwise required (directly or indirectly) in order to transfer full legal and beneficial title to the Conversion Shares to the Lender free of any Encumbrances.

8.3.  Instruction to directors of the Borrower referred to in Clause 8.2 shall be irrevocable and made by way of security for the performance of the Borrower's and the Guarantors' obligations under Clause 8.2.

8.4.  The Conversion shall be deemed completed when the Lender has acquired full legal and beneficial title to the Conversion Shares free from any Encumbrances.

8.5.  The Conversion Shares shall be credited as fully paid and rank *pari passu* with shares of the same class in issue on the Conversion Date and shall carry the right to receive all dividends and other distributions declared after the Conversion Date.

8.6.  Following the Conversion, the Outstanding Loan shall be deemed discharged and repaid in the part of the Conversion Amount.

8.7.  The entitlement of the Lender to a fraction of a Share shall be rounded up to the nearest whole number of the Shares, which result from the Conversion.

8.8.  Each of the Borrower and the Guarantors jointly and severally undertakes that, until the Conversion occurs, they shall maintain sufficient authorised but unissued share capital in the Borrower and Guarantors' authority to satisfy in full, without the need for the passing of any further resolutions of Borrower's shareholders, all of the outstanding rights of conversion for the time being attaching to the Loan under this Agreement, without first having to offer the same to any existing shareholders of the Borrower or any other person.

## 9.  LIABILITY

9.1.  The obligations of the Borrower and the Guarantors under this Agreement are joint and several. If any liability of one but not all of the Borrower and the Guarantors is, or becomes, illegal, invalid or unenforceable in any respect, that shall not affect or impair the liabilities of the Borrower or the Guarantors, as applicable, under this Agreement.

9.2.  Any liability of the Borrower or the Guarantors under this Agreement may in whole or in part be released, compromised or compounded or time or indulgence given by the Lender in its absolute discretion as regards any of the Borrower or the

Guarantors in respect of such liability without in any way prejudicing or affecting the Lender's rights against any other Party under the same or like liability, whether joint or several or otherwise, or any other person's rights against any of them in any respect.

## 10. BORROWER'S REPRESENTATIONS AND WARRANTIES

The Guarantors and the Borrower jointly and severally represent and warrant to the Lender that on the date of this Agreement each of the statements provided for in this clause 10 in respect of Borrower is true, accurate and not misleading. All such representations and warranties shall be deemed to be repeated with reference to the facts and circumstances then subsisting on the date of granting the Loan and on each next day until the earlier of: (1) any outstanding amounts under this Agreement have been paid to the Lender or (2) the Conversion occurs in respect of all Outstanding Amount:

10.1. The Borrower has full power and authority to enter into and perform this Agreement, and this Agreement constitutes binding obligations on it in accordance with its terms. The Borrower has full power, right and authority to issue the Conversion Shares to the Lender under this Agreement.

10.2. The Borrower is a legal entity duly organised and validly existing under the laws of the jurisdiction of its incorporation and has the power and all necessary governmental and other consents and licenses to own its property and assets and to carry on its business as presently conducted.

10.3. The Borrower has full power and authority to enter into and perform its respective obligations under this Agreement. All actions, conditions and things required to be taken, fulfilled and done (including, without limitation, the obtaining of any necessary consents or license or the making of any filing or registration) in order to enable it lawfully to enter into, exercise its rights and perform and comply with its obligations under this Agreement, and to ensure that those obligations are legally binding and enforceable have been taken, fulfilled and done.

10.4. All corporate actions on the part of the Borrower, its directors and shareholders necessary for the authorization, acceptance of this Loan and the exclusion of pre-emptive rights upon Conversion have been taken.

10.5. The Borrower's entry into, exercise of its rights and/or performance of or compliance with its obligations under this Agreement do not and will not violate, or exceed any power or restriction granted or imposed by:

10.5.1. any law, regulation, authorization, directive or order (whether or not having the force of law) to which the Borrower is subject;

10.5.2. constitutional documents of the Borrower; or

10.5.3. any agreement or other instrument, to which the Borrower may be a party or which may be binding on it or its assets.

10.6. This Agreement when executed will constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms;

10.7. The Ordinary Shares are fully paid up in compliance with the applicable law, and there is no liability to pay any additional contributions on the Ordinary Shares.

10.8.   The Borrower is not in violation of or in default under its constitutional documents or any material judgment, order, writ, decree, statute, rule, or regulation that is applicable to the Borrower or any material mortgage, indenture, agreement, instrument, or agreement to which the Borrower is a party.

10.9.   Litigation

10.9.1. The Borrower is not engaged, either on its own account or otherwise, in any suit, action, litigation, arbitration, tribunal proceedings or similar proceedings including, for the avoidance of doubt, any industrial or trade dispute, or any governmental investigations.

10.9.2. No suit, action, litigation, arbitration, tribunal proceedings or similar proceedings including, for the avoidance of doubt, any industrial or trade dispute, or governmental investigations is threatened by or against the Borrower, and there are no circumstances likely to lead to any such suit, action, litigation, arbitration, tribunal proceedings or similar proceedings including, for the avoidance of doubt, any industrial or trade dispute or governmental investigations.

10.10.  Tax matters

10.10.1.        The Borrower has duly filed all required tax returns (together with all attachments thereto as required by the Applicable Law) and provided all information required or requested to be delivered to any appropriate tax authority. All such tax returns and information remain in all material respects correct and complete, and none is, or is likely to become, the subject of any investigation or material dispute by or with any tax authority.

10.10.2.        The Borrower has properly and punctually paid all tax, which it has become liable to pay and it has not in the preceding three (3) year period paid or become liable to pay any penalty, fine, surcharge or interest in respect of tax.

10.11.  The Borrower has obtained all licences, permits, permissions, registrations, authorisations and consents required for carrying on its business effectively in the places and in the manner, in which such business is now carried on. All such licences, permits, permissions, registrations, authorisations and consents are in full force and effect, are not limited in duration (save for the terms thereof) or subject to any unusual or onerous conditions.

10.12.  No order has been made, petition presented or meeting convened for the winding up of the Borrower or any of its group undertakings, or for the appointment of an administrator or any provisional liquidator (or equivalent in the jurisdiction of its incorporation) (or other process whereby the business is terminated and the assets of the company concerned are distributed amongst the creditors and/or shareholders or other contributors). The Borrower is fully solvent under the applicable law.

10.13.  The choice of English law as the governing law of this Agreement will be recognised and enforced in the jurisdiction of incorporation of the Borrower.

10.14.  The payment obligations of the Borrower under this Agreement rank at least *pari passu* with all its other unsecured and unsubordinated payment obligations of the Borrower.

## 11. GUARANTOR'S WARRANTIES

11.1.  The Guarantors hereby jointly and severally make the following representations and warranties in respect of each Guarantor and acknowledge that the Lender has agreed to enter into this Agreement in reliance on these representations and warranties:

11.1.1.  each Guarantor has the necessary power and authority (including full legal and dispositive capacity) to enter into, deliver, and perform his obligations under this Agreement;

11.1.2.  each Guarantor has obtained any and all consents of any third parties as applicable (including the spousal consent) for entering into this Agreement;

11.1.3.  each Guarantor is not, by reason of illness or incapacity (whether mental or physical), incapable of managing his own affairs;

11.1.4.  when executed, this Agreement and all obligations hereunder executed or to be executed and performed or observed by each Guarantor and will represent his legal, valid and binding obligations enforceable in accordance with their terms;

11.1.5.  each Guarantor's payment obligations under this Agreement rank at least *pari passu* with the claims of all his other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by the applicable law applying to all persons generally;

11.1.6.  each Guarantor is solvent, able to meet his debts as they become due, and the fair market value of his assets exceeds the aggregate amount of his debts and liabilities as they become due, and the consummation of the transactions contemplated by this Agreement will not adversely affect the financial condition of any Guarantor. Each Guarantor has not taken any action nor have any other steps been taken or legal proceedings been started or (to the best of his knowledge and belief) threatened against such Guarantor to have him declared bankrupt;

11.1.7.  the making of this Agreement, to which the Guarantors are parties and the compliance with the terms of this Agreement will not:

11.1.7.1.  result in the violation of the applicable law; and

11.1.7.2.  contravene any provision of, or constitute a default under, any other agreement or instrument, to which any Guarantor is a party, or by which he or his property may be bound;

11.1.8.  no other authorisation, approval, consent or other action by, and no notice to or filing with, any person (including governmental authority or regulatory body) is required for the due execution, delivery and performance by the Guarantors of this Agreement;

13

11.1.9. there are no proceedings pending or threatened, and there is no existing basis for any such proceedings, against or affecting the Guarantors or any of their assets in or before any court or before any governmental authority or arbitration board or tribunal, which, if adversely determined, might individually or in the aggregate impair the ability of the Guarantors to execute, deliver and perform his obligations under this Agreement;

11.1.10. each Guarantor has read and understood the terms of this Agreement and has sought, or has had sufficient opportunity to seek, separate personal legal advice about the nature and extent of his obligations under this Agreement and is fully aware of its terms and effect;

11.1.11. the Guarantors' assets are not entitled to immunity on any grounds from any legal action or proceeding (including suit, attachment prior to judgment, execution or other enforcement); and

11.1.12. no event or circumstance exists, which constitutes a default under any agreement, deed or instrument, which is binding on any Guarantor, or by which his assets are bound, which might limit or affect his ability to perform his obligations under this Agreement.

11.2. All such representations and warranties specified in Clause 11.1 shall be deemed to be repeated with reference to the facts and circumstances then subsisting on the date of disbursement of the Loan and on each next day until earlier of: (1) any outstanding amounts under this Agreement have been paid to the Lender or (2) the Conversion occurs in respect of all Outstanding Loan.

## 12. COVENANTS

12.1. During the term of this Agreement, the Borrower shall comply with covenants provided for in the remaining provisions of this clause 12.

12.2. **Authorisations:** The Borrower shall promptly obtain, comply with and do all that is necessary to maintain in full force and effect and supply to the Lender certified copies of any authorisation, consent, approval, resolution, licence, exemption, filing, notarisation, lodgement or registration required to enable it to perform its obligations under the Agreement, to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of the Agreement and to carry on its specific businesses.

12.3. **Compliance with laws:** The Borrower shall comply in all respects with all laws, to which it may be subject, if failure so to comply would materially impair its ability to perform its obligations under this Agreement.

12.4. **Compliance with the Agreement:** The Borrower shall observe and perform the terms and conditions of this Agreement, to which it is a party, and all consents and approvals issued by relevant authorities in connection with the Loan.

12.5. *Pari passu* **ranking:** The Borrower shall ensure that its payment obligations under this Agreement rank and continue to rank at least *pari passu* with the claims of all of Borrower's other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

12.6. **Issue of shares:** without prejudice to the right of the Borrower to do any actions and things specified in this clause 12.6~~12.7~~ in case of a Liquidity Event, the

Borrower shall not issue any new shares (including in favour of any third parties) other than in accordance with this Agreement.

12.7. **Merger and liquidation**: without prejudice to the right of the Borrower to do any actions and things specified in this clause 12.7 in case of a Liquidity Event, the Borrower shall not enter into any amalgamation, demerger, merger, corporate reconstruction, dissolution or liquidation, full cessation or cessation of an essential part of the business of the Borrower or its transfer to any party without the prior written consent of the Lender.

12.8. **Access**: The Borrower shall permit the Lender or accountants or other professional advisers of the Lender free access at all reasonable times and on reasonable notice at the risk and cost of the Borrower to the office premises, assets, books, accounts and records of the Borrower and meet and discuss matters with the directors of the Borrower.

12.9. **Dividends and share redemption**: The Borrower shall not without the prior written consent of the Lender:

12.9.1. amend or restate constitutional documents of the Borrower;

12.9.2. declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) or any warrants for the time being in issue;

12.9.3. repay or distribute any dividend or share premium reserve or capital redemption or any undistributable reserve;

12.9.4. other than in the ordinary course of business, pay any management, advisory or other fee to or to the order of the Guarantors or other Affiliates of the Borrower; or

12.9.5. without prejudice to the right of the Borrower to do any actions and things specified in this clause 12.7 in case of a Liquidity Event, reduce, redeem, repurchase, defease, retire or repay any of its share capital or any warrants for the time being in issue or resolve to do so.

## 13. INDEMNITIES

The Borrower and the Guarantor undertake, jointly and severally, to keep the Lender fully and effectively indemnified against, and hold the Lender harmless with regard to, any and all losses, costs, damages, claims, demands, actions, proceedings, liabilities and expenses whatsoever (including but not limited to all legal costs or attorney's fees on a full indemnity basis) which the Lender may at any time sustain, incur or suffer as a result of or in connection with or arising from (a) any action, claim, demand, proceeding or non-compliance with any applicable laws and regulations arising on or after this Agreement; for the avoidance of doubt, this shall include any losses, costs, damages, claims, demands, actions, proceedings, liabilities and expenses whatsoever which relate to matters that existed prior to this Agreement; and (b) any breach of, or failure to comply with, any of the terms under this Agreement.

## 14. COSTS AND EXPENSES

Save as otherwise provided in this Agreement, all costs in connection with the negotiation, preparation, execution and performance of this Agreement and any documents referred to in it shall be borne by the Party that incurred the costs..

15. **COMMUNICATIONS**

15.1.    **Addresses:** Each notice (including, any demand, communication or document) given under or in connection with this Agreement shall be made in writing, and in English, signed by or on behalf of the Party giving it. Each such notice to be delivered to any Party shall be sent to that Party at the address and marked for the attention of the person (if any), as indicated below or as specified in the notice on the change of the Party's contact details under this Agreement sent to the other Parties in accordance with this Clause 15:

15.2.    The contact details of the Lender for this purpose are:

15.2.1.  Address            : 01033, Ukraine, Kyiv, Zhylianska street, 59, office 111
15.2.2.  Email Address  : valerii.kondratenko@eastforce.com.ua
15.2.3.  Attention           : Valeri Kondratenko

15.3.    The contact details of the Borrower for this purpose are:

15.3.1.  Address            : 243 Angela Drive, Los Altos, CA 94022
15.3.2.  Email Address  : Brian@formation8.com
15.3.3.  Attention           : Bon Woong Koo

15.4.    The contact details of Guarantor 1 for this purpose are:

15.4.1.  Address            : 701 Alfelm Haus, 649-5 shlnsadong, kangnamgu, Seoul

15.4.2.  Email Address  : Chahongk.46@gmail.com
_____
15.4.3.  Attention           : Cha Hong Koo
_____
_____

15.5.    The contact details of Guarantor 2 for this purpose are:

15.5.1.  Address            :243 Angela Drive, Los Altos, CA 94022
_____
_____
15.5.2.  Email Address  : Brian@formation8.com
_____
15.5.3.  Attention           :  Bon Woong Koo
_____
_____

15.6.    **Deemed Delivery:** Subject to Clause 15.7 (*Delivery by email*), any noticemay be sent by any of the below methods and if sent by a particular method shall be deemed to have been duly served:

15.6.1.  if delivered by hand, at the time of delivery at that address signed for by the recipient and dated at such address;

15.6.2. if sent by recorded delivery, at the time recorded by the delivery service as the delivery time; and

15.6.3. if sent by pre-paid airmail providing proof of postage, at 9.00 am on the third calendar day or, if posted overseas, the fifth calendar day after posting..

15.7. **Delivery by email**: A notice sent by any of the methods mentioned in Clause 15.6 (*Deemed Delivery*) shall be simultaneously dispatched to the email address of the respective Party specified in Clause 15.1 (*Addresses*), provided that such notice shall be deemed delivered and take effect when delivered in accordance with Clause 15.6 (*Deemed Delivery*). A notice given under or in connection with this Agreement shall not be valid, if sent by email only.

## 16. MISCELLANEOUS PROVISIONS

16.1. **Entire Agreement**: This Agreement and the documents referred to herein are in substitution for all previous agreements between all or any of the Parties, and contain the whole agreement between the Parties relating to the subject matter of this Agreement.

16.2. **Amendments**: No amendment or variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of the Parties.

16.3. **Severance**: If any provision of this Agreement or part thereof is rendered void, illegal or unenforceable by any legislation to which it is subject, it shall be rendered void, illegal or unenforceable to that extent and no further.

16.4. **Assignment**: The rights and obligations under this Agreement may not be assigned by any Party without the consent in writing of all the other Parties.

16.5. **Further Assurance**: The Parties shall do all such acts and things and execute and sign all such documents and instruments as may be necessary, desirable or expedient to give effect to the terms of, and the commercial understanding of the Parties recorded in, this Agreement and the documents in connection herewith.

16.6. **Third Party Rights**: Except as expressly provided in this Agreement to the contrary, the Parties do not intend that any term of this Agreement shall be enforceable by virtue of the Contracts (Rights of Third Parties) Act 1999 by any person who is not a party to this Agreement.

17. **Counterparts**: This Agreement may be executed in two or more counterparts, all of which together shall constitute one and the same instrument.

18. **Governing Law and Jurisdiction**: This Agreement shall be governed by and construed in accordance with the laws of England and Wales. Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the LCIA, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the contract shall be the substantive law of England.

**IN WITNESS WHEREOF** the Parties have duly executed this Agreement as a deed at the end of the Schedule on the date first written above.

*[remainder of this page intentionally left blank]*

**Schedule**
**FORM OF CONVERSION NOTICE**

**To:**   [●]
         [*address*]

**Cc:**   [●]
         [*address*]

**From:** [●]
         [*address*]

**Date:** _____

**CONVERSION NOTICE**
("**Notice**")

We refer to the Promissory Loan Agreement entered into among (1) NORMAN INTERTRADE LTD,, (2) HONESTBEE PTE. LTD., (3) CHA-HONG KOO and (4) BON-WOONG KOO, dated _____ (the "**Loan Agreement**").

All capitalized terms used in this Notice shall have the meaning given to them in the Loan Agreement, unless otherwise expressly provided for in this Notice.

This Notice constitutes a Conversion Notice provided for in Clause 8.1 of the Loan Agreement.

We hereby request you and the Shareholders to comply with the obligations provided for under Clause 8 (*Conversion*) of the Loan Agreement and to convert the [portion of the] Outstanding Loan in the amount of [●] into the Conversion Shares on the Conversion Date.

This Notice is not in any way exhaustive, and we reserve our rights to supplement this Notice as we see appropriate. This Notice is made without prejudice to any other claims (whether potential or actual) that we have or may have under the Loan Agreement or otherwise, and we fully reserve all rights in respect of such claims.

This Notice and any obligations arising out of or in connection with it are governed by English law.

SIGNED AND DELIVERED                    )

by [●]                                  )

acting by: [●]                          )        ………………………………………….

based on _____ )

**SIGNATURE PAGE TO THE PROMISSORY LOAN AGREEMENT**

EXECUTED AND DELIVERED AS A DEED                )

by **NORMAN INTERTRADE LTD**                )

acting by: _Valerii Kondratenko,_                )

_Director_                                        )            ....................................................

based on _Charter_                                )

_____                )

Witnessed by                                    )

_Larysa Yamdrekykova_

Residing at _8/20 Shovkunenka str._

_apt. 98, Kyiv,_                                )

_Ukraine_                                        )

Occupation: _in-house lawyer_

_____                )

[*remainder of this page intentionally left blank*]

20

SIGNATURE PAGE TO THE PROMISSORY LOAN AGREEMENT

EXECUTED AND DELIVERED AS A DEED )

by **HONESTBEE PTE. LTD.** )

acting by: )

_____

based on _____ )

....................................................

Witnessed by )

_____ Yoonki Hong _____ )

Residing at _912 Almaden Avenue_ )

_____, Sunnyvale, CA, USA_ )

_____ )

Occupation: _Associate at_ )

_____ Venture Capital fund._ )

....................................................

*[remainder of this page intentionally left blank]*

**SIGNATURE PAGE TO THE PROMISSORY LOAN AGREEMENT**

EXECUTED AND DELIVERED AS A DEED                    )

by **CHA HONG KOO**                                           )          .................................................

Witnessed by                                                        )

_Soonhye Chi_                                                      )          .................................................

Residing at _Affeim Haus,_                                      )

_Shinsadong · Kangnamgu_                               )

_Seoul, Korea_                                                      )

Occupation: _Housewife_                                      )

_____                                   )

[remainder of this page intentionally left blank]

22

**SIGNATURE PAGE TO THE PROMISSORY LOAN AGREEMENT**

EXECUTED AND DELIVERED AS A DEED                    )

by **BON-WOONG KOO** _(signature)_                    )                    ....................................................

Witnessed by                    )

_Yoonki Hong_                    )                    ....................................................

Residing at _912 Almaden Avenue_ )

_Sunnyvale, CA, USA_                    )

_____                    )

Occupation: _Associate at_                    )

_Venture Capital fund ._                    )

[remainder of this page intentionally left blank]

23